### DYETT *v.* CENTRAL TRUST Co. *et al.*

*(Supreme Court, General Term, First Department. May 13, 1892.)*

1. MARRIAGE SETTLEMENT—CONSTRUCTION—ESTATE OF WIFE.

A marriage settlement declared the following trusts: To permit the husband to receive the rents and profits for the use of himself and wife, and, in case of his death, then to permit her to receive them to her own use for life, and to enable her to maintain the children of the marriage, with remainder in fee to the children. *Held,* that the wife took an equitable life estate, which was alienable by her, and separate from the estate in remainder.

2. SAME.

The deed also declared the following trust: To sell and convey the premises, with the written consent of the husband and wife, and to invest the proceeds, with power to reinvest from time to time with the like written consent, so as to produce the best annual income, without lessening the principal of the estate. *Held,* that the deed created a merely formal trust.

3. SAME—POWER OF SALE.

Under the trust deed, trustees executed valid mortgages of the life estate of the husband and wife, which, after the husband's death, were foreclosed, and the premises sold, but, as there were infant children of the marriage, the purchaser refused to complete; and an arrangement was made whereby the widow's life estate was separately sold to the purchaser under the foreclosure, and subject thereto the trustees and the widow, under the power, duly conveyed the fee of the prem ises to him for full value. *Held,* that the sale was a valid execution of the powe of sale contained in the deed.

4. TRUSTS—SALE BY TRUSTEES—DISPOSITION OF PROCEEDS.

Where the full amount has been paid for premises, under the valid and prope exercise of a power of sale by trustees, subsequent purchasers, under the record, are in no way affected by the disposition of the proceeds.

Appeal from circuit court, New York county.

Ejectment by George Dyett against Central Trust Company, trustee under the will of John W. Southack, deceased, and others, to recover possession of one undivided twenty-fourth part of a lot and building. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and ANDREWS, JJ.

*Townsend, Dyett & Einstein,* (*A. R. Dyett,* of counsel,) for appellant. *Butler, Stillman & Hubbard,* (*William Allen Butler* and *E. D. Cowman,* of counsel,) for respondents.

O'BRIEN, J. This is an action in ejectment, commenced by the plaintiff in 1888, to recover possession of one undivided twenty-fourth part of a lot and building No. 194 Broadway, in the city of New York. The plaintiff claims as one of the heirs at law of Jessie Ann Dyett, and seeks to invalidate the title acquired in 1849 by respondents' predecessor in title. These premises have been a fruitful source of litigation for 70 years, and, though in various forms many of the questions here involved have been the subject of judicial inquiry, the precise question upon which the rights of the parties are to be determined has never been directly adjudicated. *Chapman* v. *Hammersley,* 4 Wend. 175; *Wells* v. *Chapman,* 4 Sandf. Ch. 312; *Coal Co.* v. *Dyett,* 7 Paige, 9; *Warner* v. *Hoffman,* 4 Edw. Ch. 383; *Warner* v. *Dyett,* 2 Edw. Ch. 497.

Upon the facts but little or no dispute exists, there being but a portion of one of the findings of fact contained in the decision of the judge below which is brought in question. But as these facts are voluminous, and admirably condensed in the briefs submitted, we have, so far as it was necessary to

present the questions to be discussed upon this appeal, taken abstracts therefrom.

The leading facts established at the trial were as follows: Jessie Ann Hunt, born December 22, 1799, intermarried with Joshua Dyett prior to September 19, 1821, and when she was about 20 years of age. Before and at the time of her marriage she was seised in fee and possessed of the premises No. 194 Broadway, in the city of New York, described in the complaint. This property had come to her from her maternal grandfather, who had acquired it in 1769. Marriage articles dated September 21, 1819, were entered into before the marriage between Jessie Ann Hunt and Joshua Dyett, her intended husband, and William Hammersley and Michael Dyett, as trustees, by which the premises No. 194 Broadway were conveyed to the trustees for her benefit, upon certain trusts therein declared. Afterwards, on September 19, 1821, Mrs. Dyett having come of age, and for the purpose of curing defects and mistakes in the marriage articles, a deed of trust was executed between the same parties. This deed of trust is set forth in full in the third finding of fact. It recites the main provisions of the marriage articles, and that "the said Jessie Ann Dyett hath attained to the age of twenty-one years, and is desirous, by and with the consent of the said husband, of curing the defects and mistakes in the trusts contained in the aforesaid articles, and of conveying, granting, settling, and assuring the aforesaid messuage and lot of land, or the proceeds thereof, according to what was originally intended, and as such intention is hereafter expressed." It then proceeds to declare the trusts on which the premises are conveyed to be as follows: *First.* To sell and convey the premises with the written consent of the husband and wife, and to invest the proceeds of the sale in other real estate, or upon security, and with power to change the investments from time to time, with the like written consent, so as to produce the best annual income, without lessening the principal of the estate. *Secondly.* To permit the husband to receive the rents and profits for the use of himself and wife, and, if he survived her, to receive the same to his own use during life, to enable him to educate and maintain the children of the marriage, if there should be any, and, if there were no children, then to his own use forever. *Thirdly.* In case of the husband's death, leaving his wife surviving, then to permit her to receive the rents, profits, and income to her own use for life, and to enable her to maintain the children of the marriage, and, if no children, then to her own use forever; and if there should be children, or the issue of such children, of the marriage, living at the death of the wife, then to their use forever. A further provision was contained in the deed of settlement that the husband should not alien or dispose of the rents or income, but should apply the same to the common use of himself and wife, and that the same should not be made liable for the payment of his debts; and in case of his making any sale or other disposition of such rents or income, or of his becoming insolvent, the rents, issues, interest, and profits of the estate should be paid over by the trustees to the wife, to her sole and separate use, and in like manner as if she were a *feme sole.*

On April 8, 1822, less than eight months after the making of the deed, the trustees Hammersley and Chapman petitioned the court of chancery for leave to mortgage the trust premises, and obtained two orders, made by Chancellor KENT, April 8 and April 22, 1822, authorizing such mortgages to be made, with the written consent of Joshua Dyett and Jessie Ann, his wife, the proceeds to be held subject, in every particular, to the trust declared by the trust deed. Two mortgages were accordingly made, one to the North River Insurance Company, to secure $9,000 and interest, and another to James W. Stephens, to secure $15,000 and interest. The proceeds of these mortgage loans were used by the trustees, Hammersley and Chapman, in the purchase of a factory in Dutchess county, called the "Dutchess Cotton Factory," as a

change of investment.    Joshua Dyett was placed in charge of the factory as agent.    In 1827 Dyett became insolvent.

In February, 1831, William Hammersley, then sole trustee, and Mr. and Mrs. Dyett, presented a petition to the chancellors for authority on their consent to borrow $18,000 on the house and lot in question and give a mortgage therefor, and an order was made to that effect.    This order recited the two previous mortgages, and the new mortgage was to be given to pay off the two old ones.    In April, 1831, Mr. and Mrs. Dyett, in writing, authorized Hammersley to execute the mortgage for $18,000 to the Globe Insurance Company, and thereupon the trustee and Mr. and Mrs. Dyett borrowed the $18,000 from that company, and executed a mortgage therefor on the property.    In December, 1831, the mortgagee foreclosed the mortgage, and obtained a decree for the sale of the premises.    The bond, mortgage, and decree were sold to Philip Hene, and by him assigned to the Bowery Savings Bank. In 1848 this bank filed a bill of revivor in the supreme court in equity against the trustees and Mrs. Dyett, to which none of the children were parties. Thereunder the sheriff sold the premises at auction to Leroy M. Wiley for $39,500.    He refused to complete the purchase, on the ground that he would not acquire title in fee by the sale, and the deed thereunder, because the mortgage was a lien only on Mrs. Dyett's life estate, and that her children then *in esse* were not bound by the decree of foreclosure or any sale thereunder.    At this time Mrs. Dyett was 49 years old, and had four children; her husband had died in 1843; and, except this house and lot, she had no other property.

Upon Wiley's refusal to accept the title, the mortgagee readvertised the property for sale, and then the infant children, by their next friend, commenced a suit in equity to restrain the sale, asking that the sale should be carried into effect so as to vest the title in Wiley, the purchaser in fee simple, and that the purchase money should be applied and invested according to the rights and interests of the several parties.    This action by the infant children was never tried, nor was any decree ever made thereon; but subsequent thereto an arrangement was made between Wiley, the purchaser, the mortgagee, Mrs. Dyett, and the trustees, that Wiley should purchase Mrs. Dyett's life estate under the decree of foreclosure for $23,700, (the value of the estate by the Northampton tables;) and thereupon the trustee, at her request, would sell and convey to Wiley, the purchaser, the fee of the premises, subject to the rights acquired under the foreclosure sale, for $15,800,—being the difference between the value of the life estate and the purchase money.    To carry out that arrangement, in February, 1849, the sheriff sold the life estate of Mrs. Dyett for $23,700, and executed a deed to Wiley, the purchaser.    Thereupon Mrs. Dyett gave her consent that the trustees should sell the property.    Accordingly the trustees and Mrs. Dyett executed a conveyance to Wiley, reciting the trust deed and power of sale, the death of Joshua Dyett, the consent of Mrs. Dyett, and that the trustees and Mrs. Dyett "have sold and agreed to convey to the party of the third part all the residue and remainder, after the termination of the life estate of the said Jessie Ann Dyett, and all the estate, right, title, and interest" of the grantors to the premises in question.    Thereupon the grantors, in consideration of $15,800, conveyed in fee to the grantee the premises, "subject to an estate for the life of Jessie Ann Dyett, recently sold under the foreclosure of a mortgage executed by her."    At this point it is to be noticed that in the conveyance to the purchaser, Wiley, mention is made both of the trust deed and the power of sale, and by the terms of sale there is a distinct separation of the life estate from the remainder in fee; different amounts being apportioned, as above stated, to these two separate interests.

It is insisted by appellant that the trustees had no power to convey as they did the remainder in fee of the children separated from the life estate of their

mother, nor had they any power to pay out of the proceeds—the principal—a sum of money in gross to the mortgagee for the life estate of Mrs. Dyett; that, in any event, all that the mortgagee acquired or could convey, and all that Wiley could acquire, was Mrs. Dyett's right to the rents and profits of the land, and, after its sale, the income of the proceeds during her life; that their duty was to have kept those proceeds *in solido* and intact, and to have refused to pay anybody any part of them, but to pay over to the grantee of Mrs. Dyett's life estate the income, and the income only; and that this breach of trust, with knowledge brought home to the purchaser of the circumstances, together with his knowledge of the misapplication of the moneys, affected his title, and that of his grantees, to an extent rendering it invalid as against the claims of plaintiff, as one of the heirs at law and remainder-men under the trust deed. This contention necessarily involves the true construction to be given to the trust deed; and as this has, in the litigations already referred to, been the subject of judicial interpretation, we agree in the conclusions reached by the learned trial judge below, that in some of the cases "it was held that under this trust deed Mrs. Dyett had an equitable estate which could be charged with her debts in equity, and mortgages given upon the property, by permission obtained from Chancellors KENT and WALWORTH, were considered valid and operative as against the life interest of Mrs. Dyett, although they did not, of course, affect the estates in remainder. I think the trustees took a mere naked title, and were not charged by the trust deed with any active duty respecting the property. The interpretation which appears to have been given to this deed by almost every one called upon to construe it is that the trust created was a mere formal one, and, being passive under the Revised Statutes, Mrs. Dyett acquired a legal estate of the same quality and duration as her equitable interest, and thus became a life tenant; for I do not think a fair interpretation of the trust deed would show that there was any duty or obligation on the part of the trustees of disposition or management, such as was contemplated by section 48 of the statute of uses and trusts, by which the estate of trustees in their existing trusts was preserved under such circumstances."

We do not agree with appellant that this estate of Mrs. Dyett was inalienable. We think that, under the law relating to the equitable rights of married women in respect to their separate estates, and in the absence of any disability created by the trust deed, Mrs. Dyett had as full power over her equitable life estate as if she were a *feme sole*. This, moreover, we regard as being the view expressed by the chancellor in *Coal Co.* v. *Dyett, supra,* (page 15,) that the separate estate of a *feme covert* "is liable for the payment of all her equitable debts, to the same extent as though such debts were contracted by a *feme sole.*" The mortgages, therefore, executed by her charging her estate in these lands having been valid, and the decree and sale vesting in the purchaser an estate as extensive as that possessed by Mrs. Dyett, a purchaser, had no arrangement such as was effected been entered into, would have obtained an estate in the premises entitling him to the rents and income during the life of Mrs. Dyett. It is true that these mortgages, or any of the proceedings taken thereunder, could not affect the interests of the remainder-men. The interest which Mrs. Dyett took, and which she could mortgage, is thus stated in *Warner* v. *Hoffman,* 4 Edw. Ch. 391: "The interest Mr. and Mrs. Dyett had in the property under the trust deed, and which devolved upon her solely upon the happening of her husband's insolvency in 1827, and by his subsequent death, and the interest which her children took and became entitled to from the time of their respective births, were separate and distinct interests or estates in the property,—in the parents, an equitable estate for life; in the children, a remainder in fee; both capable of being charged with debts separately contracted on the credit or for the benefit of the one or the other, or for both, as the case might be."

It is true that in these cases a distinction is made between a charge upon the fee of the land and a charge on the rents and profits. But such a distinction is apparent, it being evident that any claim or charge against Mr. or Mrs. Dyett could only affect the rights which they had, which, as stated, were an equitable estate for life. The real question is thus presented, as to whether or not, under the arrangement that was made for the sale of the fee to Wiley, it was a valid execution of the power of sale vested in the trustees. The latter had undoubted power to sell for an adequate consideration, and to invest and reinvest the proceeds of such sale, pursuant to the terms of the trust. The complaint here is, however, that the appropriation of an amount sufficient to pay the mortgages made by Mrs. Dyett out of the $39,500,— which was concededly the full value and consideration for the property,—by being taken from the principal, to that extent injured the remainder-men, and was in contravention of the terms of the trust. Whether such a complaint is justified is to be determined by the situation of affairs as they existed at the time the power of sale was exercised by the trustees. The property had been sold under the decree of foreclosure, and, had the purchaser completed, he would have been entitled to the rents and income of this property during the life of Mrs. Dyett. Thus the very purposes for which the trust deed was made—which was to secure an income during the lives of Mr. and Mrs. Dyett, which might be used, not only for their own support, but for the maintenance and education of their children—would have been destroyed, it being conceded that other than this property Mrs. Dyett was without possessions. The situation in which both the mother and the children would be placed was fully realized by the next friend of the infants, who, by the proceedings taken by him to enjoin the second sale, sought to have carried out, by the relief that he demanded on behalf of the infants, practically and in effect what was subsequently effected by the arrangement entered into between Mrs. Dyett and the trustees for the sale of the entire fee, through the instrumentality of the exercise of the power of sale by the trustees. Regarding the attitude of the infants, the proceedings taken by them through their next friend, and the resultant arrangement by which the charges against the life estate were satisfied, and an amount to represent the estate in remainder delivered to the trustees, which was available for the support and education of the infants, it is not a violent assumption to conclude that the very proceedings taken by the infants was one of the causes producing the arrangement which was entered into between all the parties.

It insisted, however, because the infants were not bound by force of any decree, and because, perhaps, the power of sale was not exercised in accordance with the letter of the trust deed, that they are in a position to repudiate the transaction, and, as against a purchaser who for full value and in good faith took the property, they are at liberty, 40 years after, to impeach a title so acquired. While the question here presented is not one of good faith entirely, but a question of power, still, where all the equities incline in one direction, it should only be as the result of no other legal conclusion that we should adjudge that a title thus acquired should be declared void. Therefore the mere form in which the transaction is clothed, or the difference in manner in which a power is exercised, should not, in a case like this, prevail, if there has not been a legal violation of the terms of the trust deed which would legally result in destroying the title. Had the trustees received the entire amount of $39,500 from Mr. Wiley, would not the mortgagee have had the right to apply to the court for the purpose of enforcing the claim which he had under the mortgage upon the life estate therein of Mrs. Dyett? and would not the effect of such an application have been to have had an appropriation of an amount equal to what was appropriated by the payment to the sheriff in discharge of the mortgage indebtedness? While it may be admitted that the life tenant could not be compelled to take a gross sum, we have in the trans-

action her co-operation and assent to the arrangement. The equity and justice of the rule applied in determining the respective values of the two estates are not called in question. As we understand the contention of the appellant, the act of the trustees was an illegal exercise of the power of sale, because the entire amount was not paid over to the trustees, to be held by them so that the income and interest might be paid to the mother, and, upon her death, the principal to the remainder-men. The latter clearly would not be entitled to both the principal and income; but, under the decisions holding that the interest of Mrs. Dyett was equitably chargeable with the amount of the mortgage indebtedness, any interest arising from an investment of the full consideration would have been payable to the mortgagees, and applicable to the payment of the mortgage debt. The effect of this, moreover, would have been to place both the mother and the children in a position of entire dependence, having no other resource out of which either the children or herself could have been maintained or supported.

It must be conceded that, if the power was properly exercised for the purpose of paying off a gross sum in satisfaction of the amount due upon the mortgages, and which was a charge upon the life interest of Mrs. Dyett, the title is not to be affected by what the trustees may have done with the amount given to them to represent the estate in remainder. This amount, had it been invested and allowed to accumulate for the benefit of the infants, would have realized a sum sufficiently large to demonstrate that the arrangement as then made was not an unjust one as regards the infants. In other words, while it may be admitted that the trustees, upon the request of Mrs. Dyett, could have conveyed the premises free of such lien to the purchaser, such lien would have attached at once to the proceeds of sale in the hands of the trustees, and would have entitled the Bowery Savings Bank to receive the entire income thereof during the life of Mrs. Dyett, until their debt, principal and interest, was fully paid. Or they might have elected to have the life interest of Mrs. Dyett in such proceeds of sale sold to pay their debt. Unless this debt was paid so that they might have the income, the real object of the trust deed would be defeated. In other words, it being apparent that a full and fair price was paid for the fee of the property, and that a sale at that price was indispensable to secure the very objects contemplated by the trust deed, it must be wholly immaterial, and a matter of form rather than of substance, as to how the two separate interests in the property should be conveyed to a purchaser.

The suit brought by the next friend, the guardian of the infants, recognized the fact that the possession of the mortgagee would cut off all the source of income of parents and children, and that it was for the advantage of both that the entire property should be sold, and the mortgage debt paid, to the end that something would remain for the support, maintenance, and education of the children, which was the aim and object of the trust deed. The arrangement made, therefore, of a sale for full value, was proper, and the only question which was presented was as to how the interests of the life tenant and remainder-men could be conveyed. As already said, this relates to form, and does not affect the power, the good faith, or the title of the purchaser, who has paid full value for the property. Wiley was a purchaser in good faith, and was not responsible for the application of the purchase money according to the trust. Nor was he affected by knowledge or notice of any fact impeaching the validity of the title acquired by him. If he had inquired further for knowledge, other than that involved in his objections upon the first sale, and the terms of the deed conveying the property to him, he would have found that the mortgage debt to the Globe Insurance Company had been held valid as a specific lien upon the premises by the decree of the court of chancery, affirmed by the court of errors, as well as by the foreclosure decree. We think, therefore, that, the power having been exercised

to effectuate and carry out the intent and purposes of the trust deed, it was a valid exercise thereof, and that a purchaser who gave full value for the property obtained a good title thereto. But if it is further insisted that Wiley was bound, from the knowledge he had as to the exact terms of the trust deed, to see that the strict letter, as to the form and manner of the execution of the power, was resorted to, then we think that, as between Wiley and the defendant here, his successor in title, a distinction is made. The record title shows the formal exercise of the power of sale vested in the executors; and, while such formal exercise might not confer good title upon one who had knowledge of facts outside the record affecting its validity, still we do not think, as against subsequent purchasers in good faith, that such knowledge, outside of the record possessed by the original grantee, can be imputed to them so as to impair or affect their title. We have, of course, in mind, the line of decisions holding that an invalid exercise of a power of sale, or the exercise of a power of sale given for one purpose when used to effect another, will not convey good title. Here, however, so far as the present defendant is concerned, it cannot be held, upon the facts appearing, that defendant is chargeable with any knowledge except such as may be derived from the trust deed itself and the records showing the manner of its exercise, no claim being made of other actual knowledge brought home. In other words, the full consideration having been paid, subsequent purchasers are in no way affected by the disposition that may be made of the proceeds realized upon a sale by trustees. Our conclusion, therefore, is that the deed of February, 1849, by the trustees and Mrs. Dyett to Wiley, was a valid exercise of the power of sale; for the reasons that the trustees having power to sell the entire fee of the property at the option of Mrs. Dyett, and having sold the same for its full value, the apportionment of the interests of the life tenant and of the remainder-men, and the acquiescence in the sale of these interests separately for the purpose of discharging a lien upon one, were, upon the facts appearing, a proper exercise of their power for the purpose of carrying out the terms of the trust deed. Had the sale been made, and the proceeds paid into court, the trustees, we think, would have been justified in paying the amount of the mortgage, which they could have been compelled to do in a suit brought for that purpose. Having, therefore, reached the conclusion that the arrangement was not in contravention of the terms of the trust deed, and that too much stress should not be placed upon the form or manner of the execution of the power in trust, and the amount originally paid for the interest of the remainder-men being adequate and fair, resulting in no injustice to them, they should not now be permitted to successfully assail the validity of a title which has been acquired by purchasers in good faith for full value. We think, therefore, that the judgment should be affirmed, with costs.

VAN BRUNT, P. J. I concur in the result of the foregoing opinion. Upon the face of the record there appears to have been a valid exercise of the power contained in the original deed of trust, and, even if Wiley did have notice which affected the title in his hands, the notice to him could not affect the title of purchasers in good faith, whose only information as to the title came from the record.

ANDREWS, J. I concur in the result.